IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>Defendants. | Civil Action No. |

## **COMPLAINT**

The United States of America alleges:

1. Only U.S. citizens are eligible to vote in U.S. federal elections. That fact is not in dispute, and there is no evidence of widespread non-citizen voting in the United States. But that is not what this case is about.

2. This case is about Section 8(c)(2) of the National Voter Registration Act (NVRA), also known as the Quiet Period Provision, which requires states to complete systematic programs intended to remove the names of ineligible voters from registration lists by no later than 90 days before federal elections. 52 U.S.C. § 20507(c)(2).

3. The Quiet Period Provision helps to mitigate the risk that errors in systematic list maintenance will disenfranchise, confuse, or deter eligible voters by ensuring that they have adequate time to address errors and understand their rights.

4. On August 13, 2024—84 days before the November 5, 2024, federal general election—the State of Alabama commenced a process to remove from its voter rolls 3,251 individuals through what it termed a "Process to Remove Noncitizens registered to vote in Alabama" (the Program). This list of impacted individuals included both natural-born and naturalized U.S. citizens who were registered, eligible voters in the State.

5. While more than 700 individuals impacted by the Program have since re-registered and returned to active status in the State's voter registration records, potentially several hundred or even thousands more registered, eligible voters from the list—U.S. citizens—remain in inactive status, stand to be harmed, and risk disenfranchisement just weeks before the upcoming federal election.

6. In this action, the United States alleges that the implementation of the Program, which has included communications directed by the State to voters containing insufficient or contradictory information, violates the Quiet Period Provision.

7. The Quiet Period Provision embodies Congress's clear and considered judgment to restrict states from systematically removing voters from the rolls in

the final days before an election. And for good reason: Systematic removal programs are more error-prone than other forms of list maintenance, and eligible voters placed on the path to removal days or weeks before Election Day may be deterred from voting or unable to correct the State's error before the election.

8. The State's unlawful actions here have confused and deterred U.S. citizens who are fully eligible to vote—the very scenario that Congress tried to prevent when it enacted the Quiet Period Provision.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 52 U.S.C. § 20510(a) and 28 U.S.C. §§ 1331 and 1345.

10. Venue is proper in this district pursuant to 28 U.S.C. §§ 81(a)(3) and 1391(b).

## PARTIES

11. The United States brings this civil action for declaratory or injunctive relief necessary to carry out the NVRA. 52 U.S.C. § 20510(a).

12. The State of Alabama is a state of the United States and is obligated to comply with Section 8 of the NVRA. 52 U.S.C. §§ 20503(a)(1), 20504.

13. Defendant Wes Allen is the Alabama Secretary of State, the chief election officer of the State of Alabama. Ala. Code § 17-1-3(a). As Alabama's chief state election official, Secretary Allen is responsible for coordinating State

responsibilities under the NVRA.  52 U.S.C. § 20509; Ala. Code § 17-4-60(a).  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### Section 8(c)(2) of the National Voter Registration Act

14. Section 8 of the NVRA establishes requirements for the administration of voter registration for elections for federal office.  52 U.S.C. § 20507.

15. Section 8(c)(2) of the NVRA, the Quiet Period Provision, specifically directs that a "State shall complete, not later than 90 days prior to the date of a primary or general election for federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A).

16. The Quiet Period Provision does not preclude the removal of names from official lists of voters at the request of the registrant, by reason of criminal conviction or mental incapacity (as provided by State law), or by reason of the death of the registrant.  52 U.S.C. § 20507(c)(2)(B)(i); *see also* 52 U.S.C. § 20507(a)(3)(A)-(B), (4)(A).

17. The Quiet Period Provision also does not preclude correction of registration records pursuant to the NVRA.  52 U.S.C. § 20507(c)(2)(B)(ii).

18. The Quiet Period Provision applies to systematic programs intended to remove the names of ineligible voters based on failure to meet initial eligibility requirements—including citizenship—at the time of registration. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343-48 (11th Cir. 2014).

19. The Quiet Period Provision thus strikes a careful balance: It permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.

**Secretary Allen's "Process to Remove Noncitizens Registered to Vote in Alabama"**

20. On August 13, 2024, Alabama Secretary of State Wes Allen announced that his office had begun implementing a process to remove from Alabama's voter rolls 3,251 individuals who have allegedly been issued "noncitizen identification numbers."

21. Secretary Allen used the term "noncitizen identification numbers" to refer to alien registration numbers, unique seven-, eight-, or nine-digit numbers assigned by the U.S. Department of Homeland Security to noncitizens, including legal permanent residents and other immigrants potentially eligible to become U.S. citizens. An alien registration number is also known as an "A-number."

22. The Alabama Secretary of State's office announced the Program 84 days before the November 5, 2024, general election.

23. The press release announcing the Program conceded that "it is possible" that some of these 3,251 individuals have become naturalized citizens. The press release did not explain what efforts, if any, had been taken to determine the current citizenship or immigration status of impacted individuals.

24. At the commencement of the Program, Secretary Allen instructed county boards of registrars to place the 3,251 individuals in "inactive" status and to send each targeted individual a form letter.

25. Being placed in inactive status meant that the 3,251 targeted individuals could not cast votes that counted without submitting paperwork to reactivate their voter registration status.

26. The initial form letter told the recipient, "Secretary of State Wes Allen has provided our Office with information that shows you have been issued a noncitizen identification number by the Department of Homeland Security. You are also a registered voter in Alabama."

27. The form letter then explained, "This letter is informing you that only eligible United States citizens that reside in Alabama may register to vote in the state. Therefore, your voter record has been made inactive and you have been placed on the path for removal from the statewide voter list."

28. The form letter then directed each recipient, "Please complete and submit the enclosed Voter Removal Request form to immediately be removed from the voter list and become compliant with state and federal law requirements."

29. The form letter then noted, "If you are a citizen of the United States and are otherwise eligible to register to vote in Alabama, please complete and submit the enclosed State of Alabama Voter Registration Form and include your current Alabama driver license number or nondriver ID number, or the last four of your social security number (if you do not have an Alabama driver license)."

30. The enclosed State of Alabama Voter Registration Form prominently stated that a voter cannot register in the 14 days prior to an election in Alabama.

31. The form letter did not instruct recipients that they could complete a voter registration form online to restore their voter record to active status.

32. The letter did not instruct recipients that they could restore their voter record to active status at their assigned polling place on Election Day by completing a distinct document, the Alabama Voter's Reidentification/Update Form.

**The 3,251 Individuals Targeted by the Program**

33. Secretary Allen developed a list of 3,251 purported noncitizens on Alabama's voter registration list by comparing voter rolls against driver's license

and ID card data from the Alabama Law Enforcement Agency (ALEA) and unemployment data from the Alabama Department of Labor (ADOL).

*ALEA Driver's License Records*

34. ALEA may associate an A-number with the record of an individual who was recorded as a foreign national at the time that they applied for an identification document, such as a driver's license or non-driver identification card.

35. Driver's licenses issued by ALEA to foreign nationals remain valid for up to four years.

36. Non-driver identification cards issued by ALEA to foreign nationals remain valid for up to eight years.

37. ALEA does not require a newly naturalized U.S. citizen to update agency records or obtain a new identification document if their foreign national driver's license or identification card has not yet expired.

38. The Program matched ALEA records of individuals for which the last credential issued by ALEA was a foreign national driver's license or identification card against the Alabama voter registration list.

39. The Program placed all voter registration records that matched against ALEA records for individuals for which the last credential issued by ALEA was a foreign national driver's license or identification card in inactive status.

40. ALEA data were matched to data in the voter registration list using the following criteria: driver's license number, date of birth, first name, last name, and last four digits of the individual's social security number.

41. The Program did not distinguish between ALEA records predating a voter's submission of a voter registration application and ALEA records postdating a voter's submission of a voter registration application.

42. The ALEA component of the Program failed to account for voters who became naturalized U.S. citizens after obtaining a foreign national driver's license or identification cards.

*ADOL Unemployment Records*

43. ADOL may associate an A-number with an individual record of an unemployment claimant.

44. The Program relied on records of unemployment claims dating back to January 10, 2020.

45. The Program relied on records of unemployment claims for individuals who selected a box denoting that they were a "noncitizen" in their application paperwork.

46. The Program used the following match criteria to compare against Alabama's voter registration list: first name, last name, date of birth, and last four digits of the individual's social security number.

47. ADOL does not require a newly naturalized U.S. citizen who previously received unemployment benefits to update agency records.

48. The Program placed all voter registration records that matched against ADOL records containing an A-number in inactive status.

49. The Program did not distinguish between ADOL records predating a voter's submission of a voter registration application and ADOL records postdating a voter's submission of a voter registration application.

50. The Program included ADOL records associated with an A-number due to paperwork errors, even if those errors had been corrected prior to the commencement of the Program.

51. The ADOL component of the Program failed to account for voters who became naturalized U.S. citizens since January 10, 2020.

***Alabama Agency Databases***

52. Alabama agency databases contain well-documented data errors. For example, a January 13, 2023, report on ADOL unemployment benefits payments highlighted shortcomings in ADOL's process to verify the accuracy of submitted paperwork.  *See* Special Report, Ala. Dep't of Pub. Examiners, *Special Report on Unemployment Compensation Payments Issued by the Alabama Department of Labor* (Jan. 13, 2023).

53. Alabama agency databases contain potentially obsolete data. For example, the ALEA driver's license database incorporates data received since 1970. *See* Press Release, Off. of the Ala. Governor, *Governor Ivey Announces New Statewide Driver License System* (Feb. 4, 2022).

**Impact of the Program**

54. The 3,251 individuals targeted by the Program include American citizens.

55. As of September 19, 2024, 717 of the 3,251 individuals targeted by the Program had Alabama voter registration records that had been restored from inactive status to active status.

56. To return to active status, Alabama law and procedures require inactive voters to submit paperwork that includes confirmation of U.S. citizenship.

57. Therefore, at least 717 individuals targeted by the Program have so far confirmed that they are in fact U.S. citizens.

58. As of September 19, 2024, only approximately 106 individuals targeted by the Program had submitted a voter removal request form.

59. Submission of a voter removal request form does not establish that a registered voter is not a U.S. citizen; nor does it establish that a registered voter is ineligible to vote in the State of Alabama.

60. The voter removal request form includes check boxes allowing voters to indicate the reason they seek removal (for example, because they no longer reside in the county where they are registered), but it does not require voters to identify the specific reason they wish to be removed. Although the form does not include a check box to indicate that a registrant is a noncitizen, voters may provide additional information elsewhere on the form.

61. When processing voter removal requests submitted in response to the Program, some officials at county boards of registrars have placed voter registration records in "disqualified" status and marked "Not a US Citizen" as the basis for disqualification, even without specific additional information concerning citizenship.

62. Secretary Allen's office has directed individual officials at county boards of registrars who have marked "Not a US Citizen" as the basis for disqualification of a voter without citizenship evidence beyond submission of a voter removal request to correct the recorded basis for disqualification. However, Secretary Allen has not provided general guidance to all county boards of registrars concerning the processing of voter removal request forms by individuals targeted by the Program.

63. Natural-born citizens were incorrectly identified by the Program based on errors in ADOL records.

64. Naturalized citizens were incorrectly identified by the Program based on outdated ALEA and ADOL records.

65. The broad reach of the Program, combined with insufficient or contradictory information provided to voters, has confused voters targeted by the Program.

66. Some voters targeted based on ADOL records never completed or submitted an application for unemployment benefits.

67. Some voters targeted based on ADOL records had previously corrected paperwork errors regarding their citizenship status in ADOL records.

68. Some county officials have been unable to explain to voters the basis for inclusion in the Program.

69. Secretary Allen's office told one voter that she was included in the Program due to an interaction with ALEA during a traffic violation, even though the voter does not drive.

70. Secretary Allen's office has responded to some voters seeking information regarding the Program by redirecting them to the U.S. Department of Homeland Security.

71. The August form letter confused some voters by directing all recipients to submit a voter removal request form to "become compliant with state

and federal law requirements" and also directing eligible U.S. citizens to complete a voter registration form.

72. Some voters targeted by the Program did not trust the process for re-registration outlined in the August form letter and elected instead to visit their local board of registrars and submit a new voter registration form in person.

73. The implementation of and public reaction to the Program illustrates the immediate problems that the Quiet Period Provision seeks to prevent.

**Secretary Allen's September Form Letter to Targeted Voters**

74. On September 18, 2024, Secretary Allen's office sent a message directing local boards of registrars to send another form letter to the 2,428 voters targeted by the Program who had, to date, neither re-registered to vote nor submitted a voter removal request form.

75. The September form letter informs U.S. citizens that they have three options to ensure that they can vote in the upcoming November 5, 2024, federal general election: (1) submit a voter registration form, postmarked by the October 21, 2024, Alabama voter registration deadline; (2) complete a voter registration form online by the October 21, 2024, Alabama voter registration deadline if the voter has an Alabama driver's license or non-driver ID; or (3) complete an Alabama Voter's Reidentification/Update form at the voter's assigned polling place on Election Day prior to voting.

76. The September form letter then notes that voters who vote absentee "are encouraged to first update" their information with their local Board of Registrar as described in the above second option.

77. The September form letter then provides, "Regardless, you will be allowed to vote absentee pursuant to the normal process."

78. These differing requirements exacerbate the confusion created by the Program.

79. Secretary Allen's office did not provide a deadline by which local boards of registrars were to mail the September form letter.

## CAUSE OF ACTION

80. The United States re-alleges and incorporates by reference the allegations set forth above.

81. Defendants' commencement of a process to remove purported noncitizens registered to vote in Alabama on August 13, 2024—less than 90 days before the November 5, 2024, federal general election—violated Section 8(c)(2) of the NVRA, 52 U.S.C. § 20507(c)(2).

82. Secretary Allen's September form letter does not cure the violation of the Quiet Period Provision or eliminate the need for relief.

83. Unless and until ordered to do so by this Court, Defendants will not resolve and remedy this violation of Section 8(c)(2) of the NVRA.

15

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an ORDER:

(1) Declaring that Defendants have violated Section 8(c)(2) of the NVRA;

(2) Enjoining Defendants, their agents and successors in office, and all persons acting in concert with them from future non-compliance with Section 8(c)(2) of the NVRA;

(3) Requiring Defendants, their agents and successors in office, and all persons acting in concert with them, to restore to active status the registration records of voters whose records were inactivated as part of the Program and who have not subsequently submitted a voter removal request;

(4) Requiring Defendants, their agents and successors in office, and all persons acting in concert with them, to provide a remedial mailing to voters who received letters as part of the Program and who have not subsequently submitted a voter removal request

    a. Informing the voters that they have been restored to active status;

    b. Explaining that these voters may cast a regular ballot on Election Day in the same manner as other eligible voters;

    c. Advising individuals who are U.S. citizens, including naturalized citizens, that their inclusion in the Program does not establish that they are ineligible to vote or subject them to criminal prosecution for

registering to vote or for voting; and

  d. Advising individuals who are not U.S. citizens that they remain ineligible to cast a ballot in elections in Alabama;

(5) Requiring Defendants, their agents and successors in office, and all persons acting in concert with them, to provide a remedial mailing to each registrant inactivated as part of the Program who subsequently submitted a voter removal request but did not expressly state on that form or in related communications that they are not a U.S. citizen, advising these individuals that if they are U.S. citizens and otherwise meet voter qualifications, they have the right to vote and are encouraged to re-register;

(6) Requiring Defendants, their agents and successors in office, and all persons acting in concert with them to provide prompt and clear information to the general public concerning the halting and reversal of the Program and the ability of impacted eligible voters to vote unimpeded on Election Day;

(7) Requiring Defendants, their agents and successors in office, and all persons acting in concert with them to take all reasonable and practicable efforts to educate county officials and poll workers concerning the cessation of the Program, the restoration of impacted voters to active status, and the ability of impacted voters to cast a regular ballot without submitting supplemental paperwork or documentation; and

(8)   Ordering any such additional relief as the interests of justice may require.

Date:  September 26, 2024

                                          Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
R. TAMAR HAGLER
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
KELLI M. SLATER
Attorneys
Voting Section, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451
daniel.freeman@usdoj.gov